IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DONALD M. WASHINGTON,

        Plaintiff,

      v.                                     Civil Action No. 1:05-CV-28

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

      Plaintiff, Donald M. Washington, (Claimant), filed his Complaint on February 15, 2005, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on January 9, 2006.[2]  Claimant filed his Motion to Supplement the Record on January 30, 2006.[3]  Claimant filed his Motion for Summary Judgment and Brief in Support on February 16, 2006.[4]  Commissioner filed her Motion for Summary Judgment and Brief in Support on March 20, 2006.[5]  Claimant filed his Response to Commissioner's Motion for Summary Judgment on April 3,

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 12

[4] Docket No. 14.

[5] Docket No. 16.

2006.[6]

B.    The Pleadings

      1.    Claimant's Motion to Supplement the Record

      2.    Claimant's Motion for Summary Judgment and Brief in Support.

      3.    Commissioner's Motion for Summary Judgment and Brief in Support.

      4.    Claimant's Response to Commissioner's Motion for Summary Judgment.

Claimant's Motion to Supplement the Record is hereby GRANTED. The Court will consider as part of the record the attachments Claimant submitted with his Motion.

C.    Recommendation

I recommend that:

      1.    Claimant's Motion for Summary Judgment be GRANTED insofar as it concerns the time period from March 12, 2001 to December 7, 2002 and DENIED as it relates to between February 28, 2000 to March 11, 2001. The record clearly indicates Claimant suffered from disabling post-traumatic stress disorder after March 12, 2001. The ALJ's decision to the contrary is not supported by substantial evidence. Before March 12, 2001, however, the ALJ's decision finding Claimant not disabled does have substantial evidence to support it.

      2.    Commissioner's Motion for Summary Judgment be GRANTED insofar as it concerns the time period from February 28, 2000 to March 11, 2001 and DENIED as it relates to the period between March 12, 2001 to the remainder of the time period in question for the same reasons set forth above.

## II.  Facts

---

[6] Docket No. 17

A.   Procedural History

Claimant first filed an application for Supplemental Security Income (SSI) payments on September 13, 2001, alleging disability since February 28, 2000.  The application was denied initially and on reconsideration.  Claimant requested a hearing before an ALJ, which he received on August 29, 2002.  The ALJ issued a decision adverse to Claimant on December 7, 2002.  Claimant requested the Appeals Council review the ALJ's decision, but it denied this request on December 14, 2004.  This action was filed and proceeded as set forth above.

B.   Personal History

Claimant was 55 years old on the date of the August 29, 2002 hearing before the ALJ.  Claimant has a high school education, as well as one and a half years of college and vocational training in the areas of asbestos removal, compressor maintenance, and turbine engine maintenance. Claimant has no prior relevant work as a compressor operator/repairman in the gas (utility) industry, a paint decorator in the glass industry, and as a construction worker in the gas (utility) industry..

C.   Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: February 28, 2000–December 7, 2002.

**Disabled Review Officer Decision, Department of Veterans Affairs, 3/11/00, Tr. 152**
Evaluation: posttraumatic stress disorder increased from 10 percent disabling to 30 percent disabling

**Andrew Talkington, M.D., 4/26/00, Tr. 155**
Assessment: Sinusitis/bronchitis, possibly a component of COPD.

**Buckhannon Medical Care, 4/27/00, Tr. 160**
Diagnosis: SOB, cough
Full result: shortness of breath and cough

Impression: no evidence for acute cardiopulmonary disease

**United Hospital Center, 2/2/01, Tr. 163**
Impression: no evidence of ischemia

**Clarksburg VAMC, 5/10/01, Tr. 176**
Diagnoses: posttraumatic stress disorder, helicobacter pylori infection, hypertension, presbyopia, glaucoma, tobacco abuse, left shoulder work related three year old trauma, low back syndrome, bilateral combat related knee trauma, skin lesion, Global Assessment of Functioning Scale of 40

**Dr. Greenbrier Almond, 5/8/01, Tr. 183**
The patient suffers from GI distress.

**Jean Ireland-Eggerth, 5/2/01, Tr. 187**
The patient has posttraumatic stress disorder and depression.

**Jean Ireland-Eggerth, 4/24/01, Tr. 192**
The patient has psychobiological dysfunctions from posttraumatic stress disorder.

**Dr. Greenbrier Almond, 3/14/01, Tr. 227**
Posttraumatic stress disorder, hypertension

**Dr. Greenbrier Almond, 3/12/01, Tr. 229**
The patient suffers from posttraumatic stress disorder, depression, chronic back, knee, and heel pain, hypertension, myocardial infarction, glaucoma, presbyopia, left shoulder trauma, low back syndrome, bilateral knees, moderate stress, GAF: 40.

Behavioral assessment: isolation.

Delusions

Orientation: disoriented to place, disoriented to time
Attention: impaired immediate recall, impaired recent memory, impaired remote memory
Judgment: impaired ability to make reasonable life decisions
Mental status summary: marked posttraumatic stress disorder

**(Nothing specified), 3/12/01, Tr. 231**
Presentation: very casual clothing
Unusual physical characteristics: combat trauma to knees and back
Posture: rigid, tense
General body movements: accelerated, increased, restless, fidgety, regular diction, no drawl
Emotional state: isolation, labile
Predominate mood: anger, hostility, fear, anxiety, apprehension, depression, sadness, regrets, panic attacks or symptoms (sometimes weekly)

Facial expression and overall physical behavior: anxiety, fear, apprehension, depression, sadness, anger, hostility, irritability
Perception: illusions, hallucinations of blood and diesel fuel and dead wood decaying
Speech/thinking: obsessions (sees faces and thinks of the dead), compulsions (keeps eyes peeled, checks locks, checks basement and windows, keeps his back to the wall), phobia of crowds, past suicidal ideation, homicidal ideation/intention/plan

## (Illegible), 3/12/01, Tr. 238
Ineffective coping related to post-traumatic stress disorder as evidenced by anger, lack of trust, isolation of self from family, depression, restless sleep

## Psychiatric Review Technique, 11/19/01, Tr. 255
Organic mental disorders: none
Schizophrenia, paranoid and other psychotic disorders: none
Affective disorders: none
Mental retardation: none
Anxiety-related disorders: post-traumatic stress disorder
Somatoform disorders: none
Personality disorders: none
Substance addiction disorders: none
Autistic disorder and other pervasive development disorders: none

(The following is arranged by functional limitation and then degree of limitation)
Restriction of activities of daily living: mild
Difficulties in maintaining social functioning: moderate
Difficulties in maintaining concentration, persistence, or pace: mild
Episodes of decompensation, each of extended duration: none

## Mental Residual Functional Capacity Assessment, 10/2/01, Tr. 270
Understanding and memory
     The ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions: not significantly limited
     The ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence
     The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions: not significantly limited
     The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to perform activities within a schedule, maintain regular attendance, the ability to be punctual within customary tolerances, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

The ability to work in coordination with or proximity to others without being distracted by them: no evidence of limitation

Social interaction
The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
The ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: no evidence of limitation

Adaptation
The ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others: not significantly limited

**Physical Residual Functional Capacity Assessment, 11/28/01, Tr. 274**
Exertional limitations
Occasionally lift and/or carry: 50 pounds
Frequently lift and/or carry: 25 pounds
Stand and/or walk: about 6 hours in an 8 hour workday
Sit (with normal breaks) for a total of: about 6 hours in an 8 hour workday
Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Doctor's Quick Care, 1/8/02, Tr. 306**
Impression: healed fractures, osteoporosis

**Doctor's Quick Care, 8/19/01, Tr. 307**
Impression: minimally displaced fractures of the right 3rd and 4th proximal phalanges.

**Radiology Diagnostic Report, 6/29/01, Tr. 321**
Impression: old healed fracture in the left 8th rib.

**Martin Levin, M.A., 3/6/02, Tr. 325**
Diagnosis: posttraumatic stress disorder, with delayed onset
Prognosis: poor
Concentration: markedly deficient

Persistence: within normal limits
Pace: within normal limits
Immediate memory: moderately deficient
Recent memory: moderately deficient
Remote memory: within normal limits
Capability: competent to manage finances if given an allowance

**Kip Beard, M.D., 3/12/02, Tr. 329**
Impression: chest pain, shortness of breath, chronic low back pain, chronic joint aches, history of right hand injury with probable posttraumatic arthritis and tendonous flexion contractures

**Dean R. Ball, D.O., 3/12/02, Tr. 336**
Impression: mild to moderate degenerative joint changes with disc spacing narrowing

**Psychiatric Review Technique, 2/7/02, Tr. 340**
Organic mental disorders: none
Schizophrenia, paranoid and other psychotic disorders: none
Affective disorders: none
Mental retardation: none
Anxiety-related disorders: recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress
Somatoform disorders: none
Personality disorders: none
Substance addiction disorders: none
Autistic disorder and other pervasive development disorders: none

(The following is arranged by functional limitation and then degree of limitation)
Restriction of activities of daily living: moderate
Difficulties in maintaining social functioning: moderate
Difficulties in maintaining concentration, persistence, or pace: moderate
Episodes of decompensation, each of extended duration: one or two

**Mental Residual Functional Capacity Assessment, 3/13/02, Tr. 355**
Understanding and memory
      The ability to remember locations and work-like procedures, and the ability to understand and remember detailed instructions: not significantly limited
      The ability to understand and remember very short and simple instructions: no evidence of limitation

Sustained concentration and persistence
      The ability to carry out detailed instructions: not significantly limited
      The ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without

being distracted by them, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions: no evidence of limitation

Social interaction

The ability to interact appropriately with the general public, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

The ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited

The ability to ask simple questions or request assistance: no evidence of limitation

Adaptation

The ability to set realistic goals or make plans independently of others: not significantly limited

The ability to respond appropriately to changes in the work setting and the ability to travel in unfamiliar places or use public transportation: moderately limited

The ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation

**Physical Residual Functional Capacity Assessment, 4/15/02, Tr. 359**
Exertional limitations:
Occasionally lift and/or carry 50 pounds
Frequently lift and/or carry 25 pounds
Stand and/or walk about 6 hours in an 8 hour workday
Sit for a total of about 6 hours in an 8 hour workday
Push and/or pull: unlimited

Postural limitations: nonestablished
Manipulative limitations: none established
Visual limitations: none establied
Communicative limitations: none established
Environmental limitations: avoid concentrated exposure to extreme cold

**K. Kaufmann, 3/8/02, Tr. 372**
COPD exacerbation/bronchitis

**Dr. Greenbrier Almond, 3/18/02, Tr. 373**
GAF: 38

D.    Testimonial Evidence

1. Claimant

Testimony was taken from Claimant, who testified as follows:

[EXAMINATION OF CLAIMANT BY ALJ]

Q    Okay, you've worked for the gas company last as a compressor operator/repairman?

A    Yes.

Q    Okay, tell me what you did as a compressor operator/repairman?

A    Tore engines apart and repaired them.

Q    How much lifting was involved in that job?

A    Quite a bit.

Q    Can you estimate the weight?

A    Anyplace from probably 25 pounds up to thousands of pounds, where we'd have to move stuff around.

Q    You didn't have to lift thousands of pounds?

A    Well, we'd have to put it on cranes, and push it up and down the building.

Q    Okay.  And you took early retirement in March of 2000?

A    February 29, 2000.

Q    Okay.  And do you receive a pension?

A    No.

Q    So, what did you get by taking early retirement?

A    One lump sum.

Q    And how much was that?

A       I think it was $70,000 some or something.

Q       Okay.  So, why did you take early retirement, Mr. Washington?

A       They were downsizing.  The company was downsizing.

Q       You didn't have any choice?

A       Well, they had told me that I can take the lump sum and go to the house; or stay and take the chance that the next week, they could possibly walk in and say, your services are no longer needed, and you just go with nothing.

                    *                    *                    *

Q       You also worked in a construction pipeline crew, right?

A       Yes.

Q       And that was just a few months in 1990?

A       Yes.

Q       Was that heavy work?

A       Yeah, yeah.

Q       What about the glass painting job?  What did you do in that job?

A       Decorated glass, painted glass.

Q       Now, were you standing, or sitting, or both?

A       Standing.

Q       And what kind of lifting was involved in that job?

A       Well, it was mainly glass like for stovetops, and washers, and stuff.

Q       Um-hum.

A       Sometimes, we would get big pieces of glass, but that wouldn't be that regular.

Different times.

Q      Did you have to lift over 20 pounds in that job?

A      Sometimes.

Q      Have you worked at all since your alleged onset date of February 28, 2000?

A      No, sir.

                    *                *                *

Q      Do you smoke?

A      Yes.

Q      How much do you smoke?

A      A pack a day.

Q      Do you have a driver's license?

A      Yes.

Q      All right.  Do you drive?

A      Yes, sir.

Q      How many miles in a typical week?

A      Maybe 20, 25, 30.

Q      Do you drink?

A      I might have a beer or so.

Q      Now, do you all live in a house?

A      Yes.

Q      Do you still have your hunting license?

A      I've never had a hunting license.

Q        There's a record you were hunting in November '01. How did you do that?

A        I've never hunted.

Q        Is that an error?

A        I've never hunted since I came back from the military.

Q        I mean - -

A        Yeah.

Q        - - the doctor said it, just so I can tell you.

A        I had a fishing license at one time, but I've never had a hunting license.

                *            *            *

Q        Dr. - - a physical therapist said you were hunting. That is incorrect?

A        That is definitely incorrect.

Q        How about a fishing license?

A        I did have a fishing license, yes.

Q        When did you last fish?

A        It's been probably five years ago, seven years ago, somewhere in there.

                *            *            *


[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q        Okay. Now, the Judge was asking you about drinking. Did - - understandably, did it upset you when your wife left?

A        Yeah.

Q        Did you drink some there when she left?

A Yeah, I did.

Q More than normal?

A Yeah.

Q Were you even drinking some whiskey then?

A Yeah, I did.

Q Was that a change for you?

A Yes, it was.  I quit drinking whiskey in '91, '92, somewhere around there.

Q Did you talk to the folks at the VA about your increased drinking?

A Yes, I did.

Q Okay.  Have you continued to drink at that level that you did after your wife left?

A No, no.

Q And why did you quit doing that?

A I just didn't like what I was doing to myself.  I just don't like drinking hard liquor to start with, and I just had - - knew that that was one part that I had to quit.

*   *   *

Q Okay.  Now, the issue about hunting, we had also discussed that - -

A Right.

Q - - because the record said that you were hunting.  Do you have any weapons?

A I don't own any weapons.

Q and when did you get rid of, of your guns?

A I got rid of my guns back in the '70's.

Q Do you also - - is there another reason why you would not be going hunting?

13

A      Yeah.

Q      What is that?

A      I don't trust people out in the woods.

Q      Okay.

A      I don't like smelling gunpowder.  I causes me to have flashbacks and think about Vietnam, and so, for that reason, I just - - I've never gone hunting since I came back out of the military.  Never.

Q      What about generally being in the woods?

A      Just generally being in the woods bothers me, also.

Q      Okay, do, do you go in the woods?

A      I tried that last year.  As a part of my treatment therapy, they said, well, you know, sometimes, you just have to let go, and try to do things that bothers you.  So, a friend of mine had a camp, and they were all going camping.  It was the 4th of July weekend of last year.  So, they invited me to go, and I went.  And that's when I got my hand crushed.  And I really didn't have much time to try to work on getting into the woods, because we had only been out like a half hour or so when the accident happened.

Q      Does being in the woods bother you?

A      Yes, it does.

Q      And is that part of the PTSD?

A      Yes.

Q      Okay.  Can you tell me what types of problems PTSD is causing you now?

A      Well, I can't sleep, I can't eat, I can't get along with any of my family.  I have a

tendency to - - I don't know whether it's trying to keep them away from me, too. I'll put it like this: In Vietnam, I lost a lot of close friends. I don't know if I still try to push my family away, to try to keep my distance there, for the fear that something will happen to me or happen to them.

Q      How long had you been married?

A      I've been with my wife for 19 years. We've been married for 10.

Q      So, that's 29 total years?

A      That would be - -

Q      That's a total of 19 years?

A      Nineteen years altogether.

Q      Okay, okay. Don, do you get - - well, do you have panic attacks?

A      Yes, I do. On a daily - - sometimes, on a daily basis; and sometimes, I might have four or five a week or so.

Q      Okay. Can you tell me, can you describe a panic attack for me?

A      Yeah. Feels almost like a heart attack. Just, I can't breathe, my stomach will tighten up, my chest will tighten up, I break out in a sweat and stuff, just - -

Q      Get nervous?

A      Yes.

Q      Heart beat fast?

A      Yes, it does.

Q      What do you do to try to get that stopped?

A      He told me just to take deep breaths, and just try to relax.

Q      Okay.

A        And they also gave me medication to take for it, also.

Q        Okay. Now, how often, again, do you think you're having those panic attacks?

A        Sometimes, a day - - once a day; sometimes, I might have two or three a day. It just all depends.

Q        Do you ever go a whole week without having a panic attack?

A        No.

Q        If you can, in an average week, how many times do you think you're having a panic attack?

A        Probably four, five, six, something like that.

Q        Okay. You've been going to the, to the VA for treatment for this PTSD.

A        Yeah.

Q        You've even - - you've been hospitalized for two months, for one two-month period?

A        Yes.

Q        Are you still receiving treatment?

A        Yes.

Q        And do you see a psychiatrist?

A        Yes, I do.

                                        *              *              *

Q        Okay. Don, I want to talk to you about some of your physical problems. Do you - - your heart.

A        Yeah.

Q       Do you have any problems with your heart now?

A       Well, I don't know.  I've been having pains across my chest and back, and in my arms, and stuff.  But because of the injury that I had to my shoulder, I don't know whether it's my shoulder hurting and causing the pain across my chest and back, or whether it's my heart.  So, I did go to request to have a stress test done to see what was going on, but I haven't heard anything back from the doctor on the stress test.

Q       Okay.  How often do you get those pains?

A       Sometimes, maybe two, three times a week; sometimes, I don't have any, sometimes.  My shoulder itself, I have constant pain in it; but the pain that shoots across my chest, sometimes that might be once or twice a week; two, three times.

Q       Now, tell me about the pain in your shoulder.  What's that from?

A       An  injury  from when I worked at Economy Gas.

Q       At that time that you were going to retire, were you having - - was that injury causing any problems?

A       Yes.

Q       Were you - - was - - were you able to complete all of your job tasks as you normally have?

A       No, I would have to go get help from someone to help me tighten up the bolts, and nuts, and stuff; or get a cheater bar and try to get it tightened up, or loosened, or whatever.

Q       At that time, were you able to lift like you had before?

A       No.

Q       Were you needing help with lifting things?

A       Yes.

Q       Did that factor into your decision to accept the retirement offers?

A       Yes, it did.

Q       Do you continue to have problems with your shoulder?

A       Yes, I do.

Q       And is that your left shoulder?

A       My left shoulder.

Q       Okay, and you're right-handed?

A       Um-hum.

Q       All right.  Now, do you also have problems with your back?

A       Yes.

Q       What type of problems do you have there?

A       My lower back hurts constantly.  I have pain in my lower back practically all, all the time.

Q       Do you know what that's from?

A       Well, I would say, from the military, when I was jumping out of airplanes, the weight that I had to carry on my back in Vietnam.  I was a senior medic.  I had to carry as much weight as everybody else, plus I had to carry extra supplies to get to the other medics if they ran low on stuff while we were out in the woods.

Q       Was your back bothering you when you were working for the gas company?

A       Yes.

Q       Was it causing you problems at that time?

A   Yes.

Q   Did that factor into your decision to accept retirement?

A   Yes, it did.

Q   Now, you also have - - you crushed your right hand.

A   Um-hum.

Q   What type of problems are you having from that now?

A   Well, pain, I can't bend it, I can't do anything with it.

Q   Can you make a fist like this?  Close your - -

A   That's it.

Q   Okay, and that's, for the record, about halfway, would you say?

A   Maybe.  That's about as far as I can get it.

Q   Okay.  Can you open your hand up?

A   I can open it, but that's as far as it can get.

Q   Do you have the strength that you used to have?

A   No.

Q   Okay.  Do you have pain in your hand?

A   Yes.

Q   What about writing?

A   Sometimes, I can write, and you can read it.  Other times, I don't even know what

it is.

Q   Um-hum.  You, you can get your finger and thumb together?

A   Yes.

Q      Okay.

A      Yes.

Q      All right, so, you can probably pick up a pen off the table or something like that?

A      Um-hum.

Q      All right.  If you use your hand repetitively, repeatedly, does that cause you any increased problems?

A      Causes it to hurt.

                        *            *            *

Q      Okay.  Don, are there any other - - are you having any, any other physical problems that we need to talk about?

A      My knees, my feet.

Q      You generally have some problems with your joints?

A      Yes.

Q      Okay.  What's your worst physical problem?

A      I would say, my knees, and my back - -

Q      Okay.  Now - -

A      - - my shoulder.

Q      Okay.  What about your hand?

A      Yeah, that, too.

Q      Now, do you get out of the house much?

A      Sometimes, I'll sit around the house all day, and not leave out.  I might just go around over by my sister's and talk to her for a couple of minutes, and head on back home.

Q        Does she live close to you?

A        Oh, she lives - - it's not far.

Q        Okay.  Is it a few miles, 100 miles?

A        No, it's about a mile.

Q        Okay.  How do you pass your time during the day?

A        Watching TV, or just lay around on the couch looking a tapes, or just sleeping.

Q        Do you have interests or hobbies now?

A        Not anymore, no.

Q        Did you used to have?

A        Yeah.

Q        Okay, what kind of things did you used to do?

A        Well, I used to like to go fishing.  I used to like to get out and sit with my buddies,

and help them work on cars, and stuff like that.  But I just don't get into it anymore.

Q        When was the last time you did that?

A        It's been a good while.

Q        Who does the chores around the house?

A        Sometimes, my daughter will come by and help me out.  My son, he did, before he

left.  He'd do different things around there.

Q        Okay, who mows the grass?

A        My son.

Q        Okay, he comes over and does that?

A        Yes.

Q     What about the shopping and that sort of thing?

A     Well, I'll go out - - if I go shopping, I'll go get maybe two, three things at a time, and come back down there.

Q     Okay, do you go to the Super Wal-Mart, or do you go to the smaller stores?

A     I try to stay away from that place just as far as I can.  I hate going out there.

Q     You go to a smaller store?

A     Yeah.

Q     All right.  What - - do you have any problem being around groups of people?

A     Yeah, I do.

Q     What do you think about people in general?

A     I don't trust them very much.

Q     Now, what about your memory and concentration?

A     I can't remember stuff very well, and I don't - - I can't concentrate on anything. And the - - doing something, walk from one room to the next, and I'll forget what I went in there for, or what I went after, or - -

Q     What happens if you smell diesel fuel?

A     It causes me to go down and think about Vietnam, flashing back to Vietnam.

Q     Are there other things that cause those flashbacks?

A     Blood, decaying wood.

Q     Is there - - and does that happen to you - - just could happen at any time?

A     Yeah.

Q     One final thing, Mr. Washington.  Do you, do you feel like you can be on your feet

lifting, carrying 10, 20 pounds a day, on your feet six hours a day?

A No.

*   *   *

[RE-EXAMINATION OF CLAIMANT BY ALJ]

Q Okay. No, did some - - you earlier, unfortunately, separated from your wife, and I believe you attribute it to PTSD; but it's not also a bankruptcy occurring, and overspending by her?

A Yeah.

Q And did that lead to the separation, as well?

A Well, it probably didn't help matters any.

Q Do you go to the VFW once a week?

A I was going to VFW once a week. I kind of got away from it.

Q When's the last time that you, that you went?

A Oh, I don't know. It's been quite a few months since I've been up there.

Q Oh.

A I was one of the color guards, and they got to the place where they was burying two, three people a day, and I don't deal with death very well, so I had to give that up, because it was starting to cause me to have problems, also.

*   *   *

Q Okay, okay, a few other references. You were mowing and washing your car in 9/01. Is that correct?

23

A       Yeah.

Q       Okay, you told Mr. Miller that you don't mow the yard?

A       No.

Q       When did you stop mowing the yard?

A       It's been, oh, a good while ago.  My son normally does the mowing.

Q       But you were doing it last fall?

A       Yeah.  I was trying to, anyway.

Q       Okay, now, you injured your right hand in an 18-B (Phonetic) accident?

A       Yeah.

Q       Okay, were you driving  - - is that a four-wheeler?  Is that another - -

A       Yes.

Q       - - word for a four - - you were driving that in August '01?

A       No.

Q       When did that occur?

A       That happened July the 4th.

Q       Of '01?

A       Yes.

                    *                    *                    *

Q       Do you still wash your car?

A       No.

Q       It says here you were doing manual labor in  your house in November '01.  Were you putting a deck on?

A       No, I had a guy to come in and do all the work around my house.

Q       What manual labor was your doctor talking about?

A       I have no idea.  I didn't get out there and do nothing.  They did it all.  That's what I paid them for.

Q       Um-hum.

A       That wasn't, wasn't in '01, anyway.  That was in 2000.

Q       Well, the - - I was just wondering if it was the deck because I know you were considering one, and this was - - this doctor wrote this in November of '01.  The therapist wrote it.       A       All of the manual stuff to be done on my home was done in 2000.

Q       "He indicates that he had work that he had to do at home," this is about your hand, " - - which included some manual labor."  That's also the hunting reference that we already discussed.  But so, that is incorrect?

A       Yeah.

                              *                    *                    *

Q       What did you do yesterday?  What time did you get up?

A       Oh, I got up yesterday, I don't know, probably be about 4:30, 5 o'clock, somewhere around there.

Q       A.M.?

A       Yes.

Q       Okay, take me through the day.

A       Well, what did I do yesterday?  I didn't do much of anything yesterday, just laid around the house.

*       *       *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q     Would you describe Mr. Washington's past work, please?

A     Yes. The most recent job was the gas company, the compressor operator/repairman. It's classified by the <u>DOT</u> as heavy, skilled work. Prior to that, he worked briefly as a construction worker with a pipeline company, which would be heavy, semiskilled. And the paint decorator in the glass company would be light, semiskilled.

Q     Do the two semiskilled jobs or the skilled job impart transferable skills?

A     There will be transferable skills to light work, Your Honor, from the machine repairing.

Q     Please assume a younger - - I mean, an individual of the claimant's age of 55, with a high school education and business college training education, precluded from performing all but medium work, does unskilled and low stress, low stress defined as one- and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry-level. So medium, unskilled, low stress. With those limitations, can you describe any work this hypothetical individual can perform?

A     Yes, Your Honor, there are jobs that would fit that hypothetical at the medium level. Some examples I could give you would be janitors and cleaners. There are 11,500 in the local labor market, 1,500,000 nation. There are vehicle washers/equipment cleaners, 630 local, 140,000 nation. There are hand packers, 400 local, 118,000 nation. And there are dishwashers, 1,100 local, 388,000 nation.

Q     Are those jobs consistent with the <u>DOT</u>?

26

A        Yes, Your Honor.

Q        Of the dishwasher jobs, Mr. Mahler, is that - - medium in the <u>DOT</u>, as you indicated, does it actually require lifting of 50 pounds?

A        Yes, it does, on occasion, yes.

Q        All of these jobs would?

A        Yes.

Q        What are you lifting in vehicle washer?

A        Basically, you're - - there's equipment you have to pick up.  There's buckets, things with liquids in them, that could be 30, 40 pounds.

Q        In the second hypothetical, if I added - - okay, in the second hypothetical of Mr. Washington, if I varied his mental status, if I assume - - if I ask you to assume that his ability to stay on task is reduced from 1/3 to 2/3 of the day, are those jobs effective in hypothetical one?

A        Yes, Your Honor.  If this was the case, these jobs would be precluded.  You'd have to be on task at least 85 percent of the workday to sustain competitive employment.

*                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY CLAIMANT'S ATTORNEY]

Q        Mr. Mahler, you mentioned earlier that there would be transferable skills to light.

*                *                *

Q        Could you tell me - - could you identify the skills?

A        Sure.  His, his training in his employment as a repairman tearing engines apart would be under the classification of industrial machinery repairs, and these types of jobs typically provide the skills such as mechanical knowledge; ability to diagnose and resolve mechanical

problems; be able to disassemble, repair, and rebuild machines; follow blueprints and schematics; using various hand tools and power tools, precision measuring instruments.  Basically, those would be the skills.

Q    Okay.  Mr. Mahler, if you assume that Mr. Washington's testimony was 100 percent credible, would there be any jobs for such a person?

A    No, there would not be.

Q    Why not?

A    Basically, the inability to, to function as indicated in the testimony and in your summaries for the GAF being 35 to 40, and 50 at the best.  That is a dysfunctional rating, and the ability to function independently would not be there.  That's a serious symptom which would preclude keeping a job.

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Can wash, bathe, dress, and shave himself (Tr. 103)

• Washes his car (Tr. 104)

• Pays his bills (Tr. 104)

• Manages bank accounts (Tr. 104)

• Runs errands (Tr. 104)

• Shops for food, clothes, medication, and cigarrettes (Tr. 105)

• Reads magazines for 15-20 minutes per day (Tr. 105)

- Reads newspapers for 15-20 minutes per day (Tr. 105)

- Watches television for 8-9 hours per day (Tr. 105)

- Goes fishing (Tr. 105)

- Watches movies (Tr. 105)

- Plays cards with friends and rides with friends in their cars (Tr. 138)

- Goes hunting (Tr. 284)

- Mows his grass with a push mower (Tr. 313)

- Attends weekly VFW meetings (Tr. 327)

- Drinks beer and whiskey and smokes marijuana (Tr. 379)

- Smokes a pack of cigarrettes per day (Tr. 400)

- Drives 20-30 miles per week (Tr. 400)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) by mis-interpreting the severity of his post-traumatic stress disorder; (2) by failing to include all of Claimant's limitations in his questions to the Vocational Expert; (3) by incorrectly determining Claimant's Residual Functional Capacity; and (4) by not considering other alleged limitations of Claimant as severe. Claimant also asks the Court to remand his case to the ALJ because Commissioner's subsequent decision awarding him disability benefits from another application, with benefits beginning the day after the denial of this application, presents new and material evidence

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered Claimant's post-traumatic syndrome to not represent a disabling condition. Commissioner also argues the ALJ properly determined Claimant's Residual Functional Capacity and correctly determined other alleged impairments as not severe within the meaning of the Regulations. Finally, Commissioner contends the case should not be remanded based on the subsequent award of disability benefits.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden.  Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.  <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.  <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.  <u>Discussion</u>

<u>The ALJ's Evaluation of Claimant's Post-Traumatic Stress Disorder Lacks Substantial Evidence</u>

Claimant first argues the ALJ incorrectly evaluated the severity of his post-traumatic stress disorder (PTSD).  Claimant contends the record shows his PTSD caused him to become disabled.  Essentially, he argues that the effects of his PTSD cause him to have no jobs available to him in the national economy.  Claimant argues the ALJ's finding to the contrary lacks substantial evidence to support it.  Commissioner asks this Court to sustain the findings of the

ALJ, arguing they have substantial evidence to support them.

Although the ALJ found Claimant's PTSD constituted a severe impairment within the meaning of the Regulations, he determined it did not qualify Claimant for disability benefits. (Tr. 18, 23-24). The ALJ's analysis of Claimant's PTSD began with determining it represented a severe impairment under the Regulations. (Tr. 18). Consistent with this determination, the ALJ proceeded to consider whether Claimant met one of the listings in the Regulations that would presume him disabled without further inquiry. (Tr. 18); 20 C.F.R. § 1520. The ALJ determined Claimant did not meet any of these listings. The ALJ therefore proceeded to the fourth step of the disability determination process, where he evaluated Claimant's residual functional capacity and considered whether Claimant had the ability to perform his past relevant work. (Tr. 19); 20 C.F.R. § 1520. The ALJ found Claimant's residual functional capacity did not allow him to perform his past relevant work. (Tr. 19). Since Claimant could not perform his past relevant work, the ALJ evaluated whether Claimant could perform other work that exists in significant numbers in the national economy, consistent with Claimant's age, work experience, education, functional limitation, and medically determinable impairments. (Tr. 19); 20 C.F.R. § 1520. Based on a question to a Vocational Expert, the ALJ held Claimant could perform the work of janitor, vehicle washer/equipment cleaner, and dishwasher. (Tr. 23). Due to the presence of other work Claimant could perform, the ALJ found him not disabled. (Tr. 23). This Court will uphold the ALJ's findings as long as substantial evidence exists to support them. Hays, 907 F.2d at 1456.

Analysis of the record reveals the ALJ's findings do not have substantial evidence to support them. The Court believes the ALJ's error comes from his failure to accord the proper

33

weight to the opinions of Claimant's treating physicians. The opinion of a treating physician will be given controlling weight if the opinion is (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. § 416.927(d)(2); Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). This Court recognizes that to say the ALJ's findings lack substantial evidence represents a truly significant statement. It is the duty of the ALJ, not the courts, to make factual determinations and to resolve conflicts in the evidence. Hays, 907 F.2d at 1456. The Court must sustain the ALJ's findings unless they lack substantial evidence. Id. Although substantial evidence involves more than a scintilla of evidence, it is not a high standard. Milburn Colliery Co., 138 F.3d at 528. Substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). With this standard in mind, the Court will explain why the ALJ's findings lack substantial evidence.

First, although the ALJ found the limitations imposed by Claimant's PTSD decreased through treatment in the spring of 2001, the record contradicts this conclusion. In his opinion, the ALJ recognized that from March 12, 2001 to May 11, 2001 Claimant underwent inpatient treatment for his PTSD. (Tr. 20). The ALJ recognized Claimant suffered from symptoms of "anxiety, fear, apprehension, anger, hostility, depression, sadness, panic attacks on a weekly basis, suicidal/homicidal ideations, compulsive acts, hallucinations, nightmares and recollection of traumatic events." Id. The ALJ also acknowledged Claimant was found to have a global assessment of functioning (GAF) score of 40, which "represents a major impairment in several areas." Id. Yet after making these findings, the ALJ summarily found Claimant's condition improved leading to his discharge from inpatient therapy in May 2001. It is true that Claimant

reported near the date of his discharge that he made improvement and wanted to continue to work on his condition. (Tr. 182). Yet this does not mean Claimant ceased to have a disability from PTSD. On March 12, 2001, Dr. Greenbrier Almond found Claimant had a GAF of 40. (Tr. 229). As the ALJ acknowledged, this represents a finding of major impairments in several areas. (Tr. 20). At the time of Claimant's discharge, the Clarksburg VAMC reported him to still have a GAF of 40. (Tr. 176). This finding at the time of Claimant's discharge plainly contradicts any conclusion that Claimant's condition had significantly improved by inpatient treatment.

While the ALJ found Claimant continued to have improved after his discharge from inpatient treatment for PTSD, the record again clearly contradicts this conclusion. A Mental Residual Functional Capacity Assessment conducted in October 2001 found Claimant suffered from moderate limitations in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, and to complete a normal workweek without interruptions from psychologically based symptoms. (Tr. 270-71). A further Mental Residual Functional Capacity Assessment in March 2002 confirmed these findings. (Tr. 355-56). This assessment also found Claimant suffered from moderate limitations in his ability to work in coordination with or proximity to others without being distracted by them. (Tr. 355). It also found moderate limitations in Claimant's ability to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in a work setting, and to travel in unfamiliar places or use public transportation. (Tr. 355-56). A Psychiatric Review Technique in February 2002 found Claimant suffered from moderate limitations in activities of daily living, maintaining social

functioning, and maintaining concentration, persistence, and pace. (Tr. 350). All this shows continued effects of PTSD.

An evaluation by Martin Levin, M.A., in March 2002 also shows the effects of PTSD Claimant continued to suffer. Levin diagnosed Claimant with PTSD with delayed onset. (Tr. 327). He determined Claimant suffered a number of symptoms related to this. (Tr. 326-27). For instance, Levin found Claimant had markedly deficient judgment, moderately deficient immediate and recent memory, and markedly deficient concentration. (Tr. 327). Levin pronounced a prognosis of "poor." Id.

Finally, Dr. Almond rated Claimant's GAF two additional times in March and June 2002, both of which showed Claimant's condition to have not improved. On March 18, 2002, Almond rated Claimant's GAF at 38 – even worse than the GAF of 40 in March and May 2001, which the ALJ admitted showed major impairments in several areas. (Tr. 20, 176, 229, 373). Then, on June 27, 2002, Almond rated Claimant's GAF as "40 and slipping." (Tr. 376). This provides extremely persuasive evidence Claimant's condition had not improved from March 2001 to June 2002.

The ALJ should have given controlling weight to the opinions of Dr. Almond and Dr. Levin. Their opinions meet the requirements of the Regulations to receive controlling weight. 20 C.F.R. § 416.927(d)(2) (requiring a physician's opinion to be (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record). The GAF scores Dr. Almond used are listed in the Diagnostic and Statistical Manual of Mental Disorders. Furthermore, the CNS Forum reports that a GAF score must be determined by a trained health professional. "Global Assessment of Functioning," CNS Forum,

*at* http://www.cnsforum.com/resources/ratingpsychiatry/global_assessment_of_functioning/ (last visited September 7, 2006).  Nothing in the record suggests Dr. Levin's report was not also conducted with valid medical techniques.  If the ALJ had given controlling weight to the report of Dr. Almond, he would have found that Claimant's condition had not improved from May 2001 to June 2002.  Furthermore, if he had given controlling weight to Dr. Levin's opinion, he would have found Claimant suffered numerous and serious symptoms of PTSD.

At the hearing before the ALJ, Claimant's counsel asked the Vocational Expert if someone with a GAF rating like that of Claimant had any jobs available to him.  (Tr. 430).  The Vocational Expert responded that if Claimant did indeed have the GAF doctors had rated him at so many times before, he could not perform any work in the national economy.  Id.  He stated that a GAF of "50 at best" was "a dysfunctional rating, and the ability to function independently would not be there.  That's a serious symptom that would preclude keeping a job."  Id.

Since Claimant does not have any work available to him in the national economy, the ALJ should have found him disabled at the fifth step of the sequential evaluation process for determining disability.  20 C.F.R. § 1520.  His decision to the contrary lacks substantial evidence to support it.

Nevertheless, the Court agrees with the ALJ's conclusion to the extent it shows Claimant not disabled before March 12, 2001.  The Court finds the ALJ's conclusion to this extent supported by substantial evidence.  Hays, 907 F.2d at 1456.  The only evidence Claimant presented that he suffered from PTSD before March 2001 came in a decision of a Review Officer from the Department of Veterans' Affairs increasing his disability finding from PTSD from ten percent to thirty percent.  (Tr. 152).  Claimant was assigned a GAF of 51.  (Tr. 153).  According

to the Vocational Expert, this would still prevent Claimant from holding any gainful employment. (Tr. 430). Yet the decision states the symptoms Claimant presented did not meet many of the requirements for a thirty percent disability finding, but that the Department nevertheless found this amount of disability by "resolving all reasonable doubt in favor of" Claimant. (Tr. 153). It is also not clear whether the person who conducted the review was a medical professional, though it may be assumed it was. The report additionally contains information adverse to Claimant, such as that his speech was goal directed and his eye contact good, and that he was cooperative and articulate. Id. Due to the lack of any strong conclusions from this report, the fact that it only rated Claimant's disability at thirty percent, and that Claimant has not presented any other evidence for his PTSD during this time period, the Court concludes the ALJ's decision has substantial evidence to support it. Thus, the Court fixes the date of Claimant's disability at March 12, 2001, when Dr. Almond found Claimant had a GAF of 40.

Even if the Court did not find Claimant entitled to disability benefits as of March 12, 2001, the Court would still find the ALJ's decision lacked substantial evidence since it failed to adequately consider all the evidence. The ALJ's failure to sufficiently analyze all the evidence may present grounds for remand. Milburn Colliery Co., 138 F.3d at 528. More particularly, A failure to expressly consider the findings of a treating physician may form the basis for remand. Leslie v. Barnhart, 304 F. Supp. 2d 623, 631 (M.D. Pa. 2003). The Court will remand where the ALJ gave less weight to the findings of a treating physician than other physicians and did not indicate his reasons for making that determination. Cook v. Barnhart, 347 F. Supp. 2d 1125, 1134 (M.D. Ala. 2004) (stating that "the ALJ must clearly articulate the reasons for giving less weigh to the opinion of a treating physician, and the failure to do so is reversible error").

In this case, the ALJ failed to give adequate consideration to numerous pieces of evidence. First, he failed to properly consider the opinions of Dr. Almond, Claimant's treating physician, as well as a report from the Clarksburg VAMC, where Claimant receive inpatient therapy. In his opinion, the ALJ states that during the spring of 2001 Claimant participated in group therapy and was treated with medications after he was given a GAF score of 40. (Tr. 20). This is true. Yet the ALJ cites to the GAF score Claimant was given by the Clarksburg VAMC upon discharge in May 2001 when he means to refer to the score given by Dr. Almond in March 2001. (Tr. 20, 176, 229). The ALJ completely ignores the fact that Claimant received two separate GAF scores of 40 between March and May 2001. (Tr. 20). The ALJ also entirely ignored the two GAF scores Dr. Almond issued for Claimant in March and June of 2002. (Tr. 373, 376). One showed Claimant's GAF to be 38 and the other showed it to be 40. (Tr. 373, 376). These provided persuasive evidence for Claimant's disability. Yet the ALJ ignored them.

Furthermore, the ALJ entirely ignored a Psychiatric Review Technique from November 2001, a Mental Residual Functional Capacity Assessment from October 2001, a Psychiatric Review Technique from February 2002, and a Mental Residual Functional Capacity Assessment from March 2002. (Tr. 255, 270, 340, 355). The Court finds the failure to examine so many and so significant pieces of evidence unexplainable. Surely this by itself would justify remand to the ALJ.

Thus, the Court finds summary judgment in favor of Claimant is appropriate from the period beginning March 12, 2001 to the date of the ALJ's decision. Before that time, summary judgment should be granted in favor of Commissioner. Should the District Court find summary judgment not appropriate, this Court would recommend remanding the case to the ALJ so he may

more fully consider all the available evidence. Because the Court makes this recommendation, it need not consider Claimant's remaining arguments concerning PTSD. The Court also declines to consider Claimant's arguments regarding the ALJ's failure to properly evaluate his physical impairments since the two evaluations Claimant uses to support his theory both occurred after the time the Court has already recommended Claimant be found disabled.[7]

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED as relating to the time period of March 12, 2001 to December 7, 2002 and DENIED as relating to the time period of February 28, 2000 to March 11, 2001. The record plainly indicates Claimant suffered from disabling PTSD after March 12, 2001. The ALJ's decision to the contrary lacks support in substantial evidence. However, the ALJ's decision denying benefits does have substantial support as it relates to the period between February 28, 2000 to March 11, 2001.

2. Commissioner's Motion for Summary Judgment be GRANTED as relating to the time period from February 28, 2000 to March 11, 2001 and DENIED for the remainder of the time period in question for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

---

[7]Claimant relies on a Physical Residual Functional Capacity Assessment from Dr. Thomas Lauderman dated November 18, 2001 and an evaluation by Dr. Kip Beard dated March 12, 2002.

which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: September 14, 2006

<u>/s/ James E. Seibert</u>
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE